IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIMINAL ACTION |
| v. | : | No. 12-418-1 |
| ROBERT LAMAR WHITFIELD | : | |

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIMINAL ACTION |
| v. | : | No. 12-418-2 |
| MARLON GRAHAM | : | |

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIMINAL ACTION |
| v. | : | No. 12-418-3 |
| KAREEM LONG | : | |

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIMINAL ACTION |
| v. | : | No. 12-418-5 |
| FRANK THOMPSON | : | |

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIMINAL ACTION |
| v. | : | No. 12-418-6 |
| KENNETH PARNELL | : | |

**MEMORANDUM**

**Juan R. Sánchez, J.**                                                    **June 27, 2014**

     In May 2013, a jury convicted Defendants Robert Lamar Whitfield, Marlon Graham, Kareem Long, Frank Thompson, and Kenneth Parnell of federal offenses relating to their involvement in a planned robbery of a purported drug stash house from which they believed at

least ten kilograms of cocaine could be stolen. The convictions were the product of a sting operation by the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF), in which an undercover ATF agent posed as a drug courier looking to recruit a team to rob a Philadelphia drug stash house of which he had inside knowledge. Contrary to what Defendants had been led to believe, there was no actual stash house or cocaine to steal.

In October 2013, five months after the jury returned its guilty verdicts, Defendants filed motions for a hearing and for discovery on the issue of racial profiling/selective prosecution alleging they were targeted for prosecution by ATF's Philadelphia District Office, with the complicity of the U.S. Attorney's Office for the Eastern District of Pennsylvania, based on their race.[1] Defendants seek to compel the Government to disclose information about other "phony stash house robbery cases" prosecuted in this district from 2006 to the present based on investigations conducted by ATF or other federal law enforcement agencies, and about the Government's protocols, practices, and procedures with respect to the investigation and prosecution of such cases, so that they may pursue a motion to dismiss the indictment in this case based on racial profiling/selective prosecution. Because Defendants waived their selective prosecution claim by failing to raise it prior to trial, and because they also have not made the threshold showing required to obtain discovery on this issue, their motions will be denied.

**BACKGROUND**

When the ATF investigation that led to the prosecution in this case began in May 2012, the subject of the investigation was not any of the eventual Defendants, but instead an individual named Kwasi Payne. Trial Tr. 59, May 14, 2013. ATF decided to target Payne for a potential

---

[1] Defendants Whitfield and Graham each filed a motion for a hearing and discovery on the issue of racial profiling/selective prosecution, which Defendants Long, Thompson, and Parnell have joined. The motions seek substantially the same materials from the Government.

sting operation because it had information that Payne, along with Whitfield, had been involved in home invasion robberies.[2] *Id.* at 60. Although ATF had been in contact with Payne through a confidential informant (CI) via phone and text message, the CI subsequently lost contact with Payne. *See id.* at 59-60; Trial Tr. 11-12, May 15, 2013. On June 13, 2012, at ATF's direction, the CI reached out to Whitfield for the purpose of reestablishing contact with Payne, asking Whitfield to give Payne the CI's phone number. In response to a question from Whitfield, the CI confirmed he was trying to contact Payne about a "situation," i.e., a robbery, at which point Whitfield expressed interest in the opportunity, saying "[t]hat's what I do." *See* Trial Tr. 73, 88-89, May 14, 2013. The CI continued to contact Whitfield in an effort to get back in touch with Payne. Because Whitfield continued to express interest in the "situation" the CI had to offer, and because ATF's efforts to reestablish contact with Payne through Whitfield were unsuccessful, the focus of the investigation eventually shifted from Payne to Whitfield, who was known to ATF to have committed home invasion robberies with Payne in the past. *See id.* at 61.

On June 27, 2012, an undercover agent met with Whitfield and the CI to determine whether Whitfield was a viable target for the sting operation. *See id.* at 130-31. Based on information Whitfield provided during the meeting about other home invasion robberies in which he had been involved, ATF determined he was. *See id.* During the meeting, the undercover agent also described the fictitious stash house to which he claimed to have access in his capacity as a courier for a drug dealer in New York, providing information about the layout, staffing, and security at the stash house and offering suggestions about how a robbery could be committed.

---

[2] The undercover agent testified ATF developed this information as early as October 2010, and had also received information from the confidential informant involved in the sting operation in this case that Payne and Whitfield were involved in home invasion robberies. Trial Tr. 60, May 14, 2013.

The undercover agent emphasized he did not want any "young boys," but was looking for a professional robbery crew. *See id.* at 115-16.

Whitfield thereafter recruited others to participate in the robbery, both directly and indirectly (through those he had recruited), ultimately assembling an eight-person robbery crew that included the four other Defendants who were tried in this case in May 2013. On the morning of July 18, 2012, the members of the robbery crew met the undercover agent at his hotel, arriving in groups of two. After each of the first two groups arrived, and again after the entire eight-person crew was assembled, the undercover agent described the robbery scenario to ensure all of the participants were aware of the purpose of the meeting and what the group was planning to do. The group thereafter drove in a caravan of five cars from the hotel to a nearby junkyard where a van the undercover agent had procured for use in the robbery was parked. While at the junkyard, ostensibly awaiting a call from the undercover agent's employer with the location of the stash house, an ATF response team arrested the members of the robbery crew.

Following their arrests, all eight crew members were indicted on charges of conspiracy to commit robbery which interferes with interstate commerce (Count One), attempted robbery which interferes with interstate commerce and aiding and abetting (Count Two), conspiracy to possess with intent to distribute five kilograms or more of cocaine (Count Three), attempted possession with intent to distribute five kilograms of cocaine and aiding and abetting (Count Four), and carrying, and aiding and abetting the carrying of, a firearm during and in relation to a crime of violence and a drug trafficking crime (Count Five). Long and Thompson were also charged with being a convicted felon in possession of a firearm (Count Six). Whitfield, Graham,

4

Long, Thompson, and Parnell proceeded to trial, and on May 22, 2013, the jury found each Defendant guilty of Counts One through Five.[3]

In June 2013, the month after the trial in this case, *USA Today* ran an article about ATF's increased reliance on fake drug stash house robbery sting operations over the past decade. The article was critical of ATF's use of the strategy which, according to the paper's investigation, regularly "ensnare[d] low-level crooks who jump at the bait of a criminal windfall," when it was "meant to target armed and violent criminals." *See* Brad Heath, *Entrapment?*, USA Today, June 28, 2013, ECF No. 282-1. ATF's use of such sting operations received additional media attention in August 2013, when *USA Today* reported that the Chief Judge of the U.S. District Court for the Northern District of Illinois had granted discovery on a selective prosecution claim in a pending case based on a "strong showing of potential bias" in the use of fake stash house robbery stings in the Chicago area. *See* Brad Heath, *Do ATF Stings Target Minorities?*, USA Today, Aug. 2, 2013, ECF No. 282-1.[4]

---

[3] The jury acquitted Long and Thompson of Count Six.

[4] As reported, on July 31, 2013, Chief Judge Rubén Castillo issued identical two-page orders granting limited discovery on racial profiling and selective prosecution claims in two separate phony drug stash house rip-off cases: *United States v. Brown*, Crim. No. 12-632 (N.D. Ill. filed Aug. 15, 2012), and *United States v. Williams*, Crim. No. 12-887 (N.D. Ill. filed Nov. 15, 2012). The orders did not address the merits of the defendants' claims, but found they had made a sufficient showing to warrant limited discovery on the issue of "potential racial profiling and selective prosecution" based on data they compiled about seventeen phony stash house rip-off cases prosecuted in the Northern District of Illinois since 2006, which revealed that an "overwhelming" proportion of the targets in those cases were African Americans.

In his original orders in these cases, Chief Judge Castillo directed the Government to produce (1) a list of all phony stash house rip-off cases brought in the Northern District of Illinois from 2006 to the present, including the race of each defendant in each case; (2) all documents containing instructions given from 2006 to the present by supervisors in the U.S. Attorney's Office for the Northern District of Illinois about the responsibility of Assistant United States Attorneys to ensure defendants (including defendants in phony stash house rip-off cases investigated by ATF) have not been targeted or prosecuted due to their race, color, ancestry, or national origin; and (3) any documents prepared by ATF summarizing how to investigate and

5

These media reports caught the attention of the Defendants in this case and their attorneys, who expressed interest in pursuing a claim based on potential racial bias in this case. *See* Def. Parnell's Supplemental Mot. to Join in Co-Def. Kareem Long's Mot. for Extension of Time in Which to File Rule 29 and Rule 33 Mots., ECF No. 282 (requesting an opportunity to explore the issue of racial profiling in this case based on the *USA Today* articles described above). Following a September 9, 2013, status conference and by agreement of the parties, the Court set a schedule for the filing and briefing of "any motion for a hearing or discovery regarding a claim of 'potential bias'" and other post-verdict motions.

In October 2013, Defendants filed their motions for a hearing and for discovery, seeking to compel the Government to produce materials substantially similar to those sought by the defendants in the Chicago cases publicized in *USA Today* (though the court had ordered production of only a subset of those materials). Like the Illinois defendants, Defendants in this case argue discovery on the issues of racial profiling and selective prosecution is warranted based on information they have compiled about the racial composition of the defendants

---

prosecute phony stash house rip-off cases, including guidelines for selecting appropriate targets. *See, e.g.*, *United States v. Brown*, Crim. No. 12-632, Order (N.D. Ill. July 31, 2013), ECF No. 153. After the defendants expanded their data regarding the racial composition of defendants prosecuted in phony stash house rip-off cases in the Northern District of Illinois to include an additional eight cases (for a total of twenty-five), Chief Judge Castillo also ordered the Government to produce "all racial and ethnic data which relates to the use of confidential informants by the ATF from 2006 to the present." *See, e.g.*, *United States v. Brown*, Crim. No. 12-632, Order (N.D. Ill. Nov. 8, 2013), ECF No. 171.

Other judges in the Northern District of Illinois have since considered similar motions for discovery on the issues of racial profiling and selective prosecution based on the same showing made by the defendants in *Brown* and *Williams*, reaching different conclusions as to whether and to what extent discovery is warranted based on the defendants' showing. *See United States v. Paxton*, No. 13-103, 2014 WL 1648746, at *6 (N.D. Ill. Apr. 17, 2014) (permitting discovery, but finding defendants' requests "broader than necessary"); *United States v. Alexander*, No. 11-148-1, 2013 WL 6491476, at *6 (denying discovery, except as to a single redacted document reflecting ATF's selection criteria); *United States v. Davis*, Crim. No. 13-63-2, Order (N.D. Ill. Oct. 30, 2013) (permitting discovery; currently on appeal).

prosecuted in phony stash house robbery cases in the Eastern District of Pennsylvania. Specifically, Defendants have identified a total of six phony stash house robbery prosecutions pursued in this district since 2009 (including this one), in which all of the twenty-four defendants prosecuted have been African American.[5] Based on this information, Defendants ask this Court to require the Government to produce the following materials:

> a.  A list by case name, number and the race of each defendant of all phony stash house robbery cases brought by the United States Attorney's Office for the Eastern District of Pennsylvania from 2006 to the present based on investigations conducted by ATF or any other federal law enforcement agency, and any documents that show the information [regarding the phony stash house robbery cases identified by Defendants] is incorrect.
>
> b.  For each such case listed in response to section "a" above, a statement of prior criminal contact that the federal agency responsible for the investigation had with each defendant prior to initiating the phony stash house robbery. . . .
>
> c.  The statutory or regulatory authority for ATF or any other federal law enforcement agency to instigate and/or pursue phone stash house robbery cases involving any illegal drugs (e.g. heroin, cocaine, crack, ecstacy, methamphetamine, etc.), or any decision by any federal agency, the Justice Department or the White House to authorize ATF or any other federal law enforcement agency to pursue such cases in the Eastern District of Pennsylvania.
>
> d.  All national and Philadelphia Field Office ATF manuals, circulars, field notes, correspondence or any other material which discuss "stings", "reverse stings", "phony stash house ripoffs or robberies" or entrapment operations, including protocols and/or directions to agents and to confidential informants regarding how to conduct such operations, how to determine which persons to pursue as potential targets or ultimate defendants, how to ensure that the targets do not seek to quit or leave before an arrest can be made, and how to ensure that the agents are not targeting persons for such operations on the basis of their race, color, ancestry or national origin.

---

[5] In its opposition to Defendants' discovery motions, the Government does not contest Defendants' assertion that all of the defendants in the six phony stash house robbery cases they have identified were African American, and the Court therefore assumes this assertion is correct. Although not identified by Defendants, this Court presided over an additional phony stash house robbery case, *United States v. Melendez Placencia*, Crim. No. 09-669 (E.D. Pa. filed Sept. 17, 2009), in which all five defendants were Latino. In that case, however, the investigating agency was U.S. Immigration and Customs Enforcement, not ATF.

  e. All documents that contain information on whether and how supervisors and managers of the Philadelphia Area ATF and other federal law enforcement agencies involved in phony stash house robbery cases sought to determine whether or not its agents and informants were targeting persons on the basis of their race, color, ancestry or national origin for these phony stash house robbery cases, and what actions did the Philadelphia Area ATF (i.e, operating in the Eastern District of Pennsylvania) or other federal law enforcement agency supervisors and managers took to ensure that agents and/or informants were not targeting persons for such operations on the basis of their race, color, ancestry or national origin.

  f. The number of confidential informants that the Philadelphia Area ATF has used in each year from 2006 to the present and the number of those confidential informants who had access to non-African American or persons of non-African descent who could be targeted for a phony stash house robbery case[].

  g. The factual basis in each case [identified by Defendants] and cases produced in response to the above and the cases produced in response to paragraph [a] regarding decisions made to pursue or initiate an investigation against any of the individuals listed as defendants in these cases.

  h. All documents containing instructions given during the time Michael Levy or Zane David Memeger have been the United States Attorney for the Eastern District of Pennsylvania about the responsibilities of Assistant United States Attorneys to ensure that defendants in cases brought by the Office of the United States Attorney for the Eastern District of Pennsylvania have not been targeted due to their race, color, ancestry or national origin and specifically that those persons who are defendants in phony stash house cases in which ATF was the investigatory agency have not been targeted due to their race, color, ancestry or national origin and that such prosecutions have not been brought with any discriminatory intent on the basis of the defendant's race, color, ancestry or national origin.

  i. All documents that contain information about all actions taken during the time Michael Levy or Zane David Memeger have been the United States Attorney for the Eastern District of Pennsylvania about the responsibilities of the Assistant United States Attorney[s] for the Eastern District of Pennsylvania to ensure and/or check to determine that defendants in cases brought by the Office of the United States Attorney for the Eastern District of Pennsylvania have not been targeted due to their race, color, ancestry or national origin and specifically that those persons who are defendants in phony stash house cases in which ATF was the investigatory agency have [not] been targeted due to their race, color, ancestry or national origin and that such prosecutions have not been brought with any

> discriminatory intent on the basis of the defendant's race, color, ancestry or national origin.

Def. Whitfield's Mot. for Hr'g and for Discovery on the Issue of Racial Profiling/Selective Prosecution 7-10.[6]

**DISCUSSION**

Defendants seek discovery in order to pursue a post-verdict motion to dismiss the indictment based on selective prosecution and/or selective enforcement.[7] These claims do not relate to the guilt or innocence of the defendant, but challenge "a constitutional defect in the institution of the prosecution." *United States v. Berrigan*, 482 F.2d 171, 175 (3d Cir. 1973). Under Federal Rule of Criminal Procedure 12, such claims must therefore be raised by motion before trial. *See* Fed. R. Crim. P. 12(b)(3)(A) (providing "a motion alleging a defect in instituting the prosecution" must be raised before trial). If a defendant fails to raise a selective prosecution defense prior to trial, the defense is waived. *See United States v. Brookins*, 413 F. App'x 509, 514 (3d Cir. 2011); Fed. R. Crim. P. 12(e) (providing a party waives any Rule 12(b)(3) defense not raised by the pretrial motions deadline set by the court); *accord United States v. Edwards*, 188 F.3d 230, 237 (4th Cir. 1999) (holding defendants' "failure to raise the selective prosecution claim before the trial, as required by [the Federal Rules], constitutes a waiver of such claim" (citation and internal quotation marks omitted)); *United States v. Gary*, 74 F.3d 304, 313 (1st Cir. 1996) (holding absent exceptional circumstances, "a claim of selective

---

[6] In his discovery motion, Graham seeks substantially similar materials as Whitfield and also seeks information regarding the race of each confidential informant used by ATF since 2006.

[7] Because Defendants' allegations of racial bias concern not only the decision to prosecute them but also the decision to target them in an ATF sting operation, the Court understands them to be raising a potential claim of selective enforcement as well as a claim of selective prosecution. *See Paxton*, 2014 WL 1648746, at *3 n.4 (construing a similar racial profiling claim as a selective enforcement claim).

prosecution that is not raised prior to trial is deemed waived"); *United States v. Mann*, 884 F.2d 532, 539-40 (10th Cir. 1989) (declining to address a selective prosecution claim that was not raised until after trial); *United States v. Jarrett*, 705 F.2d 198, 204-05 (7th Cir. 1983) (holding a defendant "waived his selective prosecution motion by failure to file until two months after trial").[8]

Although a court may excuse a defendant's waiver of a selective prosecution defense for "good cause," *see* Fed. R. Crim. P. 12(e), Defendants have not shown good cause for their failure to pursue this issue prior to trial. At the oral argument on the motions for discovery, Defendants argued there is good cause to grant relief from the waiver in this case because their investigation regarding the racial composition of the defendants prosecuted in phony stash house robbery cases in this district was prompted by newly discovered evidence—media coverage of the decisions from the Northern District of Illinois permitting discovery on this issue. The orders that were the subject of the media attention concerned defendants' allegations of racial bias in ATF sting operations in the Northern District of Illinois. The orders did not find the defendants in those cases had in fact been targeted for prosecution because of their race; rather, they found only that the data the defendants had compiled about other similar prosecutions were sufficient to justify limited discovery on the issue. While the media coverage of the decisions may have motivated Defendants to look into the racial composition of those prosecuted as a result of similar sting operations in this district, virtually all of the information Defendants present in

---

[8] While this Court is not aware of any cases expressly holding a claim of selective enforcement must be raised by motion prior to trial under Rule 12(b)(3)(A), a selective enforcement claim, like a selective prosecution claim, does not affect the defendant's guilt or innocence, but implicates the court's right to hold the defendant for trial. The Third Circuit has recognized that other defenses of this nature are based on alleged defects in the institution of the prosecution and are therefore waived unless raised prior to trial. *See United States v. Pitt*, 193 F.3d 751, 760 (3d Cir. 1999) (holding a defendant waives the defense of outrageous government conduct by not raising the issue prior to trial).

support of their motion was available to them prior to trial. Indeed, the indictments in three of the five phony stash house robbery cases (other than this one) included in Defendants' data were returned before the indictment in this case, and in all but one of those five cases, the indictments were returned prior to the trial in this case. In these circumstances, the fact that Defendants did not perceive a potential selective prosecution defense prior to trial does not constitute good cause to excuse their waiver of the defense. *See United States v. Tolentino*, 486 F. App'x 286, 288 (3d Cir. 2012) (holding "an excuse of waiver should be granted only if 'compliance with the procedural requirement [was] virtually impossible'" (quoting *United States v. Pitt*, 193 F.3d 751, 760 (3d Cir. 1999))); *Gary*, 74 F.3d at 313 (suggesting a waiver of a selective prosecution claim should be excused only in "exceptional circumstances"); *cf. United States v. Gonzales*, 927 F.2d 139, 143-44 (3d Cir. 1991) (declining to enforce waiver of an outrageous government conduct claim based on the defendant's failure to raise the claim prior to trial where the information on which the claim was based "was not available to [the defendants] until the eve of the trial, apparently by way of out of time discovery"). The Court notes that in all of the Northern District of Illinois cases of which this Court is aware that raise the issue of racial profiling/selective prosecution in the context of an ATF phony stash house sting, the defendants sought discovery prior to trial.

Moreover, even if they have not waived this defense, Defendants have not made the threshold showing required to obtain the discovery they seek. As the Supreme Court has repeatedly recognized, prosecutors have broad discretion in enforcing the criminal laws, and, absent "clear evidence to the contrary," they are presumed to have "properly discharged their official duties." *United States v. Armstrong*, 517 U.S. 456, 464 (1996) (quoting *United States v. Chem. Found., Inc.*, 272 U.S. 1, 14-15 (1926)); *see also Wayte v. United States*, 470 U.S. 598,

11

607 (1985). Courts are "properly hesitant" to examine executive decisions about whom to prosecute, in part because the considerations underlying such decisions—e.g., "the strength of the case, the prosecution's general deterrence value, the Government's enforcement priorities, and the case's relationship to the Government's overall enforcement plan"—are "not readily susceptible to the kind of analysis the courts are competent to undertake." *Wayte*, 470 U.S. at 607-08; *see also Berrigan*, 482 F.2d at 180 (observing "[f]ew subjects are less adapted to judicial review than the exercise by the Executive of his discretion in deciding when and whether to institute criminal proceedings, or what precise charge shall be made, or whether to dismiss a proceeding once brought" (citation omitted)). Judicial deference to executive decisions about whether to prosecute "also stems from a concern not to unnecessarily impair the performance of a core executive constitutional function." *Armstrong*, 517 U.S. at 465; *see also Wayte*, 470 U.S. at 607 (noting "[e]xamining the basis of a prosecution delays the criminal proceeding, threatens to chill law enforcement by subjecting the prosecutor's motives and decisionmaking to outside inquiry, and may undermine prosecutorial effectiveness by revealing the Government's enforcement policy").

Nevertheless, prosecutorial discretion is not absolute, but is "subject to constitutional constraints," including the requirement that "the decision whether to prosecute may not be based on an unjustifiable standard such as race, religion, or other arbitrary classification." *Armstrong*, 517 U.S. at 464 (citations and internal quotation marks omitted). To establish a selective prosecution claim, a defendant must "demonstrate that the federal prosecutorial policy had a discriminatory effect and that it was motivated by a discriminatory purpose." *Id.* at 465 (citation and internal quotation marks omitted). To establish a discriminatory effect in a case in which the defendant alleges he was selected for prosecution based on his race, the defendant "must show

12

that similarly situated individuals of a different race were not prosecuted." *Id.* Because of the presumption of regularity that attaches to prosecutorial decisions, a defendant must prove a selective prosecution claim by "clear evidence." *See id.* at 464-65; *United States v. Taylor*, 686 F.3d 182, 197 (3d Cir. 2012).

While a defendant need not meet the clear evidence standard to obtain discovery on a selective prosecution claim, because discovery "imposes many of the costs present when the Government must respond to a prima facie case of selective prosecution," the standard for discovery in aid of a selective prosecution claim is still rigorous. *Armstrong*, 517 U.S. at 468. The defendant must produce "some evidence tending to show the existence of the essential elements of the defense, discriminatory effect and discriminatory intent." *Id.* (citation and internal quotation marks omitted). With respect to the discriminatory effect element, a defendant must make a "credible showing" that similarly situated defendants of other races could have been prosecuted but were not. *Id.* at 469-70; *see also United States v. Bass*, 536 U.S. 862, 863 (2002); *United States v. Hedaithy*, 392 F.3d 580, 607 (3d Cir. 2004).

Although the Supreme Court in *Armstrong* addressed the showing necessary for a defendant to obtain discovery on a selective prosecution claim, several federal courts of appeals have held the same standard applies to requests for discovery on the issue of selective enforcement. *See, e.g.*, *United States v. Alcaraz-Arellano*, 441 F.3d 1252, 1264 (10th Cir. 2006); *United States v. Barlow*, 310 F.3d 1007, 1010 (7th Cir. 2002).[9] Indeed, Defendants implicitly

---

[9] The Third Circuit has not addressed this issue; however, the Third Circuit has recognized that while selective prosecution and selective enforcement are distinct claims, the standards governing such claims are "virtually identical." *Davis v. Malitzki*, 451 F. App'x 228, 234 n.11 (3d Cir. 2011); *compare Taylor*, 686 F.3d at 197 ("To establish selective prosecution, the defendant must provide evidence that persons similarly situated have not been prosecuted and that the decision to prosecute was made on the basis of an unjustifiable standard, such as race, religion, or some other arbitrary factor." (citation and internal quotation marks omitted)), *with*

13

acknowledge as much, seeking discovery "despite" the decision in *United States v. Barlow*, in which the Seventh Circuit held "a defendant seeking discovery on a selective enforcement claim must meet the same 'ordinary equal protection standards' that *Armstrong* outlines for selective prosecution claims." 310 F.3d at 1010 (quoting *Armstrong*, 517 U.S. at 465). *See* Def. Whitfield's Mot. for Hr'g and for Discovery on the Issue of Racial Profiling/Selective Prosecution 6; Def. Graham's Mot. for Hr'g and for Discovery on the Issue of Racial Profiling/Selective Prosecution 6.

In this case, Defendants attempt to meet their burden to show "some evidence" of both discriminatory effect and discriminatory intent based on information regarding the racial composition of the defendants prosecuted in six phony stash house robbery cases (including this one) that have been pursued in this district based on ATF (and, in one instance, FBI) sting operations since 2009. Defendants argue this information, which shows all twenty-four defendants prosecuted in the six cases were African American, is sufficient to warrant discovery on the issue of racial profiling/selective prosecution.

This data suffers from the same infirmity as the data presented in support of the defendants' selective prosecution claim in *Armstrong*. To support their claim that they were selected for federal prosecution for crack offenses because of their race, the defendants in *Armstrong* submitted information from the federal public defender's office indicating that in each of the twenty-four drug cases closed by that office in 1991, the defendant was black. *See* 517 U.S. at 459. The Supreme Court held this "study" fell short of the required "some evidence" of discriminatory effect because it "failed to identify individuals who were not black and could

---

*Hill v. City of Scranton*, 411 F.3d 118, 125 (3d Cir. 2005) (holding to establish a selective enforcement claim, the claimant must show (1) there are other similarly situated persons against whom the law was not enforced and (2) the selective treatment was based on an "unjustifiable standard, such as race, or religion, or some other arbitrary factor" (citation omitted)).

have been prosecuted for the offenses for which [defendants] were charged, but were not so prosecuted." *Id.* at 470.

Defendants argue this case is distinguishable from *Armstrong*, in which the Supreme Court noted the defendants "could have investigated whether similarly situated persons of other races were prosecuted by the State of California and were known to federal law enforcement officers, but were not prosecuted in federal court." *Id.* Defendants contend that unlike the situation in which there is a pool of offenders from which only certain offenders are selected for prosecution, in the phony stash house robbery sting scenario, the Government instigates the crime and thus controls not only who is selected for prosecution but who is offered the opportunity to commit the crime in the first instance. Defendants maintain that they have sufficiently demonstrated discriminatory effect and intent by showing the Government has solicited only African American individuals for stash house robbery stings.

While it is true that this case is factually different from *Armstrong* in ways that impact the manner in which Defendants could be expected to demonstrate the discriminatory effect element of their claim, this factual distinction does not justify relieving Defendants altogether of the burden to show similarly situated defendants of other races were treated differently. *Cf. id.* at 466-67 (rejecting the argument that showing a failure to prosecute similarly situated individuals of other races is not an absolute requirement of a selective prosecution claim, and emphasizing the importance of preserving the similarly situated requirement "where the power of a federal court is invoked to challenge an exercise of one of the core powers of the Executive Branch of the Federal Government, the power to prosecute"). The Third Circuit has recognized that discriminatory effect may in some instances be proved through statistical evidence of bias. *See Bradley v. United States*, 299 F.3d 197, 206 (3d Cir. 2002). In this regard, the Court of Appeals

has acknowledged that unlike the selective prosecution context, in which a defendant "would be able to name others arrested for the same offense who were not prosecuted by the arresting law enforcement agency," defendants alleging "they were stopped [by law enforcement] due to racial profiling would not, barring some type of test operation, be able to provide the names of other similarly situated motorists who were not stopped." *Id.* at 206 n.11 (quoting *Chavez v. Ill. State Police*, 251 F.3d 612, 640 (7th Cir. 2001)). In such circumstances, "statistical evidence of discrimination may be the only means of proving a discriminatory effect." *Id.*

To be probative of bias, however, "[t]he statistics proffered must address the crucial question of whether one class is being treated differently from another class that is otherwise similarly situated." *Chavez*, 251 F.3d at 638; *see also Hedaithy*, 392 F.3d at 607-08 (holding evidence that although several thousand people cheat on the "Test of English as a Foreign Language" each year, only sixty foreign nationals of Arab or Middle Eastern descent who allegedly participated in a scheme to pay impostors to take the exam for them were prosecuted did not constitute credible evidence of discriminatory effect because the evidence did not indicate those who cheated but were not prosecuted were involved in widespread conspiracies or had paid someone else to take the exam for them). It is not enough to show the racial composition of the individuals targeted by law enforcement; rather, the statistics must compare the racial composition of those targeted to some appropriate benchmark. *See, e.g.*, *Bass*, 536 U.S. at 864 ("[R]aw statistics regarding overall charges say nothing about charges brought against *similarly situated defendants*."); *Chavez*, 251 F.3d at 635, 642-45 (suggesting that to prove state police officers' actions had a discriminatory effect on African American and Hispanic motorists via statistical evidence, plaintiffs would need reliable data on not only the racial makeup of those stopped, detained, and searched, but also the racial makeup of motorists

16

on Illinois highways); *State v. Soto*, 734 A.2d 350, 360 (N.J. Super. Ct. 1996) ("Statistics may be used to make out a case of targeting minorities for prosecution of traffic offenses provided the comparison is between the racial composition of the motorist population violating the traffic laws and the racial composition of those arrested for traffic infractions on the relevant roadway patrolled by the police agency.").

Because Defendants' data focuses only on the racial composition of those targeted in phony stash house robbery stings and says nothing about the existence of similarly situated individuals of another race who could have been targeted but were not, the data is insufficient to satisfy Defendants' burden to produce some evidence of discriminatory effect. *See United States v. Alexander*, No. 11-148, 2013 WL 6491496, at *4 (N.D. Ill. Dec. 10, 2013) (holding data regarding seventeen phony stash house robbery cases prosecuted in the Northern District of Illinois since 2006, in which 75% of the defendants prosecuted were African American, "fail[ed] to fulfill the discriminatory effect prong of the *Armstrong* test" because such data "sa[id] nothing about whether the ATF or the United States Attorney chose not to conduct or prosecute stash-house robbery sting cases for similarly situated individuals of another race").[10]

Defendants also argue this case is distinguishable from *Armstrong* in that the Government has refused to provide them with any information about the criteria ATF uses in selecting targets for phony stash house robbery stings. In *Armstrong*, by contrast, the Government produced evidence explaining why it had chosen to prosecute the defendants federally (albeit in an effort to persuade the district court to reconsider its order granting the discovery the defendants sought). Defendants argue in the absence of information regarding ATF's selection criteria—

---

[10] *But see Paxton*, 2014 WL 1648746, at *5 (finding the same data regarding phony stash house robbery prosecutions in the Northern District of Illinois were "sufficient to meet the 'some evidence' requirement under Seventh Circuit precedent").

without which they cannot meet their burden to identify similarly situated individuals of other races whom ATF declined to target—they should be deemed to have satisfied their burden under *Armstrong* based on their existing showing.

Recognizing the difficulty of identifying similarly situated non-minorities who were not targeted in phony stash house robbery stings absent information about the selection criteria used by the informants and ATF in such stings, the district court in *Alexander* allowed "limited discovery of the ATF's policies and procedures regarding the selection criteria for the targets of phony stash-house robbery cases in place at the time of Alexander's arrest."  2013 WL 6491476, at *5.[11]  Defendants urge this Court at a minimum to order similar discovery in this case.  The Government argues such discovery is not only unwarranted but unnecessary given the testimony at trial about the reasons why Whitfield and those he recruited came to be the subject of the sting operation in this case.

At trial, the undercover agent explained that ATF selected Kwasi Payne as the target of the sting operation because it had developed information that Payne, along with Whitfield, was involved in home invasion robberies.  Trial Tr. 60, May 14, 2013.  The focus of the sting operation eventually shifted to Whitfield after he learned the confidential informant was trying to contact Payne about a robbery opportunity and expressed interest in doing the robbery himself,

---

[11] Specifically, after reviewing in camera a six-page excerpt from an ATF manual that included provisions relating to the identification of targets for phony stash house robbery sting operations, the court ordered disclosure of certain portions of the six-page document, subject to a protective order.  *See Alexander*, 2013 WL 6491476, at *5.  At least one other federal district court has followed a similar approach.  *See United States v. Hare*, No. 13-650, 2014 WL 1573545, at *2 (D. Md. Apr. 17, 2014) (finding defendants "had failed to make the showing of discriminatory effect and discriminatory intent required under *Armstrong*" based on information regarding the racial composition of the defendants in four other similar prosecutions in the District of Maryland, but ordering the Government to produce a one-page excerpt from an ATF operations manual setting forth procedures and guidelines for selecting a target because "Defendants would otherwise have no way of learning the government's criteria for selecting targeted individuals").

and after ATF determined he was a viable target for the sting based on information he provided to the undercover agent about his involvement in other home invasion robberies.  Because the undercover agent's trial testimony that Whitfield was selected for the sting based on his experience in committing other home invasion robberies provides sufficient information about the actual selection criteria employed by ATF in this case, the Court agrees production of ATF's selection criteria is unnecessary in this case.[12]

Because Defendants waived their selective prosecution and selective enforcement claims by failing to raise them before trial, and because they have failed to make the "credible showing of different treatment of similarly situated persons" required to obtain discovery on such claims under *Armstrong*, 517 U.S. at 470, the motions for a hearing and discovery on the issue of racial profiling/selective prosecution will be denied.

An appropriate order follows.

BY THE COURT:


   /s/ Juan R. Sánchez          
Juan R. Sánchez, J.

---

[12] In light of this testimony, the Court rejects Defendants' contention that "the pool of similarly situated whites in this case is the entire adult white population of the Eastern District of Pennsylvania."  Def. Whitfield's Supplemental Mot. for Discovery on the Issue of Racial Profiling/Selective Prosecution and Br. in Supp. Thereof 3, ECF No. 346.